And that is 2325.12, Demona Freeman v. Ocwen Loan Servicing. And good morning, Mr. Wood. Good morning, Your Honor. You may begin any time that you are comfortable. Thank you, Your Honor, members of the panel, my colleagues. Let me begin by setting the framework of this case. This case is about a recidivist debt collector who instituted a foreclosure on a consumer who was not even in default. The consumer was required to hire a counsel who had to defend the foreclosure, and all that occurred prior to filing the suit in this case. Without counsel's intervention, based on its normal operating procedures, Ocwen would have taken Demona Freeman's home because that's how their processes worked without intervention of counsel. Now, in addition to those issues, she also received the other things that we've heard a lot of cases about out of this court lately, letters that were wrong, calls that were unwanted, door knocks, messages, communications that were false. But at the end of the day, without the intervention of counsel, she would have lost her home. So her injury is not trivial, fleeting, insignificant, or unrecognized by any law, statutory or common. Mr. Wood, may I start you, please? Yes, ma'am. What was happening between June of 2018 when Ocwen first called Freeman and erroneously told her she was in default of her mortgage loan, and October 31st, when Freeman filed an answer and counterclaim to the Bank of New York's second foreclosure case? Was anyone trying to point out Ocwen's error and correct it? Yes, ma'am. And I meant to warn Judge Brennan that he might feel deja vu when he heard this argument today, because he was on my panel five years ago in the Sacamino case that covered the exact same conduct post-jury verdict. So, yes, ma'am, Ms. Freeman was communicating, trying to communicate. Ocwen's testimony on the point was that they had bungled a bankruptcy reconciliation, something they were obligated to do correctly under a consent decree with the federal government. And they did that, and it caused them to declare her loan to be in default, and it caused them to institute foreclosure, and it caused them to demand payment from her of thousands of dollars. I'm going to stop you for a second, because did she dispute the inaccurate information in her credit report by submitting a dispute to a consumer reporting agency? Yes, ma'am. If you'd like to talk about that point, let me make this, I think, a very important point that the APALE has tried to cloud. The term dispute has a very specific meaning under the FCRA. The term dispute encompasses a consumer notifying a credit reporting agency. The FCRA defines when a consumer contacts the furnisher as a direct dispute, and that is a statutorily defined term. I believe the site is 10 CFR, CFR 1022.43. But when a consumer or the law on the FCRA uses the term dispute, it encompasses contact with the CRA to trigger the S2B rights of the consumer. Which consumer reporting agency did she submit the dispute to? And we're talking about, you know, between June 2018 and October 31st. There is a dispute noted in the record in AA239 in the appendix, Your Honor. And I believe that credit bureau was Equifax, and I believe they required a response during the month of October of 2018. And is there evidence that the credit reporting agency sent a notice of the dispute to AQUIN within five days? Yes, ma'am. This document came from AQUIN. Within five days? Yes, ma'am. And where is that evidence? It's AA0239 in the appendix. And what is the evidence that AQUIN failed to conduct a reasonable investigation? Your Honor, you can read AQUIN's own judicial admissions at pages 6 through 8 of their brief, where they discuss the course of events with their request for information, where when they actually, under the RESPA obligations that Mr. Corr invoked, they actually went and investigated the accuracy of their accounting, they readily and easily discovered their error. So the fact that they did not readily and easily discover their error as part of their credit reporting investigation leads to a very easy influence that they did a poor to non-existent reinvestigation. You may continue. Okay. With respect to the concrete injury analysis, Congress, in its wisdom, recognized that the FDCPA was crafted to prevent abuse of debt collection. And Congress, in its findings, set out a number of injuries that consumers suffered because of abuse of debt collection that were real and substantial and tangible. This is a classic example of the type of real, substantial, life-altering change that can come from abuse of debt collection. Ms. Freeman's lived under a cloud from this event now for six years. And it is not resolved. Is, would you agree that AQUIN's duty to investigate would only arise after the CRA informs it of the dispute not when the consumer disputes directly to AQUIN? Would you agree? Yes, ma'am. Under the FCRA, AQUIN has no duties which Ms. Freeman can enforce unless she makes a dispute through a CRA, which is what she did despite AQUIN's attempt to muddy those waters. AQUIN made the challenge to the complaint on that grounds holding documents of its own that it provided to my counsel colleague saying that they had received a notice and they had the opportunity to respond. You know, I should, I guess I should explain my problem. Yes, ma'am. I do not, I did not see that Ms. Freeman alleged that she disputed the credit information with any CRA.  On information and belief, AQUIN has improperly and incorrectly reported to various CRAs that the loan was and or is 90 to 119 days late period. Yes, ma'am. And I'm not certain that that's a sufficient allegation because what she should have alleged, it seems to me, is that she reported the dispute to the CRA, not to the lender or servicer. And then that AQUIN received notice of the underlying dispute from the CRA because AQUIN's duty to investigate only arises after the CRA informs it of the dispute, as I mentioned, not when the consumer disputes directly to AQUIN. So you help me with that. Yes, ma'am. Ms. Freeman never made a dispute to AQUIN. That would be what the law calls a direct dispute. That did not occur. The disputes were made to the CRAs. And at the time AQUIN filed this motion to dismiss, they already held records which they provided to my colleague saying they had received those disputes. So their obligation was triggered statutorily. And in our record, we pointed to, at AA0239, at least one instance that's in this appendix where they had a dispute to Equifax about this account before Mr. Koren filed suit in December of 2018. Despite having that information and despite knowing they had received those disputes, they've come to this court and tried to muddy the waters and say that the complaint says we disputed with AQUIN. Disputes only occur under the FCRA to a CRA. When you dispute to the person who reported, the CRAs, the credit reporting law, calls that a direct dispute. And we never once have alleged that we made a direct dispute because that's not actionable under the FCRA. So what AQUIN has asked for, and it's our concern, and bear in mind, we were not at summary judgment with the FCRA claim. We were dismissed on a motion to dismiss and we were not given a chance to amend that claim. If Judge Pratt had asked us to correct to say which CRA and what date, the heightened obligations under Rule 9, we could have done that. We were not given the opportunity. Mr. Wooten, in the last five years there's been a lot of law that's been issued with regard to standing. Yes, sir. Specifically, the case presents three intangible potential injuries and one tangible injury. Among the intangible injuries, there's been alleged the defamation false light, the intrusion upon seclusion, and the third one as well with regard to abuse of process. Among those three, just talking about the intangible, what is your client's best argument? Obviously, if you want to take someone's house when they're not in default, that's a pretty big one. So I would think in this particular circumstance, while we talked about abuse of process, wrongful litigation, it's also a trespass, a title and a trespass, even though we didn't argue that, I understand. But yes, whenever you're trying to take someone's home and they're actually paid three months ahead, it's kind of a problem. So the third of the three intangibles you believe is your strongest? Yes, sir, but we think they all qualify and we think the conduct that she was exposed to in the interim constitutes what we've also known as assault because there was unwanted communications that put her in fear of harm but didn't rise to the level of a battery because there was no physical contact, right? But definitely, the invasion of privacy intrudes upon seclusion and false light because under the FDCPA also, the inaccurate credit reporting is actionable even without any dispute whatsoever. And that's part of the trick in this case is it's easy to cross the wires among the two statutes and the requirements, but the FDCPA requires nothing but the false publication or a failure to note it as disputed. But in this instance... Oh, I'm sorry, please finish your thought. I'm so sorry. I apologize. I wanted to reserve some time. I'll stand here all day if you'll let me. Oh, okay, fine. No, I am going to give you that time because we're asking you questions. But I did want to just mention something. You know, the district court granted two requests to amend and then denied the third because it occurred outside of the deadline. So, you know, I think we need to, you know... I'd like to cover that ground if you'll hear me on that, Your Honor. So, the two amendments were made in the nature of supplementing additional factual allegations related to post-litigation conduct, so conduct that occurred beyond the filing of the case in December of 2018. The one thing that never changed was the FCRA complaint. And that was actually answered twice. I mean, answered, as in no motion, filed an answer twice. And then when we restated the complaint on the Second Amendment, then they came in and said, you didn't tell us which consumer credit reporting agency you reported to or you disputed to. You didn't give us enough detail. At the time, they're holding the disputes in their hand and know exactly what they are. So, it's a technical case of gotcha, not a lack of notice about what had occurred. But it seems that, and you tell me if I'm wrong, it seems that no good cause for needing to amend was given other than that she wanted to, quote, fix any deficiencies. Is that incorrect? And in the motion for reconsideration, according to the court, you did not identify how she would fix the deficiencies in the Second Amendment complaint if you were granted leave to amend outside of the deadline. Well, yes, Your Honor. Let me say this. There was no analysis under Seventh Circuit precedent about whether an amendment should be allowed. There was sort of a summary comment that because it's beyond the deadline, I'm not allowing it, and you didn't give us good reason in your motion to reconsider. But the motion to reconsider pointed out that the record already contained evidence showing that Aquin had received disputes through a CRA even when they made the challenge on the complaint. So, again, you know, the way, and we've cited cases about how the FCRA works, and the Seventh Circuit has never required us to allege that the furnisher, that the CRA did its job under the law. We've always been allowed to presume that if we file the dispute with the CRA, that they do, in fact, carry out their legal obligation and provide it to the furnisher, and we've cited numerous cases for that proposal. It started with the unpublished case of Lange, but there's at least two cases beyond Lange that rely upon Lange that are published from the district courts. And so, in essence, we got gotcha'd by a defendant that knew that it had received disputes. And so when Judge Pratt made the decision to toss the count on the technical content, she did not allow us the opportunity to address that. Had she done so, we could have laid out each of the disputes that we had had from those records at that point and explained that to the court in great, great detail. And I apologize, I've gone over my time, but I'm happy to answer any other questions. Don't you worry. Do either of you have any other questions? Nope, okay. Okay, you'll get your three minutes. Mr. Lynch, please. May it please the court, my name's John Lynch. It's my first opportunity to argue in the Seventh Circuit, so I'm very pleased to be here. Welcome. I'm representing the applicants. We're very happy. We love it when we have new people. Thank you, thank you very much. And I represent the Appellees Oquin and Boney. There is no appeal being taken against Boney, so the two issues are against Oquin. One is the motion to dismiss on the FCRA claim. The other is the summary judgment on the standing issue on the fair debt. If it's okay with the court, I would start with the FCRA claim. Mr. Lynch, can I ask you a question about that one? It seems to me that Mr. Wooten is arguing, I have the exact same questions that Judge Rovner has, okay, but I want to ask them a little different way. I don't see anywhere in the complaint where the plaintiff alleged that they notified one or more of the consumer reporting agents. I don't see that in the complaint. But it seems to me that Mr. Wooten is arguing today that it doesn't have to be a direct notification to the CRA, that he can do something else or that she can do something else to dispute the accuracy of the credit report. Can you respond to that argument? Yes. So under FCRA, there's four elements, and there's no allegations of the second, third, and fourth element in paragraphs 41 through 55 or 278 through 281 in the second amended complaint. That is a required element that you dispute the inaccurate information by submitting a dispute to a CRA. Mr. Wooten has said that, oh, we're hiding the ball. They know, the plaintiff knows and has the burden to allege if they submitted a dispute to the CRAs. They did it. They have that information. There's no allegation in the complaint of that element whatsoever. Then the next element, Judge, is the CRA transmitted a notice of the dispute to the furnisher within five days of the receipt by the CRA? Hold on. That would be hard for her to allege in a complaint. I mean, I may be with you on the first argument that you have to make a notice or dispute to the CRA, but I don't know how she could allege it, but based on what? I mean, plaintiffs all over the country get that information from the CRA. But let's say they didn't. Let's say they didn't do that. Would that not still be a violation of the law? If that didn't occur, that would be a violation of the law. One thing I'd point out on that particular element is Mr. Wooten and the plaintiffs say that that's attached to the complaint, but they never reference it in an allegation or say what the ACDV said between Equifax or one of the CRAs and Auckland. Right. You can't plead by attachment. You can't plead by attachment. It may be impossible for a judge to go through hundreds of pages potentially of attachments. We believe that's waived for a couple of reasons. They attach the documents. They don't plead it or reference it at all. They also don't make that argument in opposition to the motion to dismiss,  to the appendix to this court. Also, one other point on this is the motion for reconsideration was not appealed at all. So they somehow came up with that information. They had that, Judge Kirsch, and they attached it, but again they didn't reference it. And then on the fourth element is they didn't tie the allegations of what was being disputed from the CRA to Auckland and say if Auckland would have conducted a reasonable investigation, what would have changed. On those three elements, there are no factual allegations in the complaint whatsoever. And a couple other points there. It was the third complaint that they had, and actually they had a fourth, but they corrected other issues. And one thing you'll see in the record is they never filed even after the deadline a motion for leave to amend with a proffer of how they would cure the FCRA deficiencies at all. So there was never a formal motion for leave that was even denied. It was really just in the conclusion of a motion or a brief. They say, please give us leave to amend. They filed a reconsideration, and the judge said there was no good cause at all and it was a lack of diligence. And that argument wasn't made in the opposition to the motion to dismiss. We believe the district court in denying the reconsideration completely acted within its discretion. And again, there was no separate motion for leave with an attached complaint making those allegations. I'd like to move to standing. In the last number of years, our court has had a number of decisions with regard to what constitutes a concrete and particularized injury. I'm specifically thinking about the analog to common law. I asked Mr. Wooten about it, the various intangible injuries. Specifically, the intrusion upon seclusion, the invasion of privacy. Here we've got the 12 phone calls, we've got the hangers, the hangers given to the neighbors. What is your best argument as to why that would not constitute a concrete and particularized injury of an intangible harm? I knew when I came here, given the panel, you know this area of the hall, and I think you've all written on it. On those common law torts, the Pacillo case, I believe, is right on point. They weren't alleged in the complaint. We're here at summary judgment, but in the Pacillo case, I believe Judge Brennan and Judge Kirsch, you both were on that case. You specifically stated, even at summary judgment, it had to be alleged in the complaint, and it wasn't alleged in the complaint. We believe that's the easiest way to dismiss this. The second reason is, if there's door knockers, if there's some sort of credit or something like that, the act occurred, but under this precedent in the Seventh Circuit, it's not enough that the act occurred, it has to materialize into harm. And all that was done by the plaintiff in this case when we filed summary judgment, is they filed a declaration with a bunch of self-serving allegations that weren't supported by any documents and weren't supported by any admissible testimony. So we believe we have it under both prongs, the waiver that it's not in the complaint. Second of all, there was nothing, any actual harm that materialized. So what did the door knocker do? You can't just say you had fear of the door knocker. That's not enough under the Seventh Circuit law. And what did the foreclosure do? You've got cases in the Seventh Circuit saying just having to hire an attorney isn't enough, and just having to file a lawsuit's not enough. What's the actual materialized harm? And they didn't have it. One other point here, this was a five years of litigation with a lot of discovery, and there were several motions in limine that were granted in our favor. Some were medical evidence, some were credit reporting documents, and none of those motions in limine were appealed. And we believe the... You look at... When you look at standing and you look at whether the actual materialized harm occurred, maybe hypothetically in another case some of these things could have been harm, but you have to look at the record in this case and was there any admissible evidence of actual materialized harm. And in this record, just like the district court stated, there is no admissible evidence. Mr. Lynch, though, what about... My review of the record shows that on February 24, 2018, Quicken Loans requested her credit report from TransUnion, and on May 12, 2018, Chase Card did the same thing. The record indicates that presumably the credit report was disseminated to both Quicken Loans and Chase, which contained her inaccurate credit reporting. Why is that not enough? Why under our cases and why under TransUnion is just simple reputational harm not enough to confer standing? First of all, none of that is alleged in the complaint. I know, but we're at the summary judgment stage, so that's different. And our cases... My review of our case, when we talk about standing, we review the record at summary judgment. We're reviewing the record, not just the complaint. And my understanding on the Seventh Circuit, it still has to be in the complaint, then you look at those same allegations at summary judgment, but I understand. So my understanding, Judge Kirsch, is you still have to show reputational harm and there's no evidence of reputational harm. It never materialized into reputational harm. Well, I think she testified, or she had a deputization, that a company called OneMain denied a loan request in February 2018. And that was at the same time that Oswin was reporting her existing loan as severely delinquent. The OneMain documents were excluded by a motion in limine, and that's just self-serving testimony. No documents from OneMain ever came into evidence. There was no testimony from OneMain. That's just her self-serving testimony saying, just like there is some other testimony from her husband that her credit's all messed up and we couldn't even get a roof. So again, it's the admissible evidence, Judge Kirsch, that is missing. I'm not saying that under different records and different cases, that may give rise to Article III standing, but in this case, all we have is her own self-serving statements and a declaration. There's no admissible evidence other than her testimony. Mr. Lynch, you know, we've long held that a plaintiff's own, quote, self-serving, unquote, testimony is sufficient to create a material fact dispute, as long as it isn't conjecture, and it's based on the plaintiff's own firsthand knowledge. So why would it not be sufficient for Freeman, for instance, to point to her husband's testimony that the couple had difficulty getting a roof done on credit? Well, first of all, I'll answer it a number of ways. Her husband's testimony about the roof had no causal connection to reporting from Auckland at all, none at all. Her saying the credit's all messed up and they couldn't get a roof. She obviously had filed bankruptcy. She had other things on her credit report. No causal connection to Auckland. Also, my understanding is the standard on Article III injury is the plaintiff has the burden of proof and has to present admissible evidence. It's not a genuine issue of material fact standard, like on summary judgment, that the Article III burden is higher, and you actually have to prove it by admissible evidence, the injury in fact. If there was a material issue of genuine fact on Article III injury, we don't believe that's the standard. The standard is the plaintiff needs to prove it. There's so much causal connection. There's two things. You have to have a harm that's actually materialized, and you have to have the causal connection between the actual harm that materialized in Auckland's reporting. That's what's missing here. They don't have a letter from a creditor saying, we're denying credit because Auckland reported her. And we believe, again, I understand, Judge, about self-serving statements being enough to get past summary judgment, but we believe you just can't say under the Seventh Circuit precedent that I'm upset and I had anguish. You've got to show some harm from that actually materialized, and you've got to tie it to the act. I don't have any other questions. I don't have any other questions either. Thank you very much. Thank you, Mr. Lynch. Thank you so very much. Thank you. All right. We're going to give Mr. Wooten those three minutes. Thank you, Your Honor. Do you think, in retrospect, a lot of stress might have been avoided if she had just gone back into bankruptcy court to fix any errors or not? Your Honor, to be clear, the litigation has been split in the district court. There is a pending discharge injunction claim in the district court, bankruptcy court, related to the bankruptcy violations that is separate and apart from these consumer claims. While there may be some overlap, there is no complete overlap. But the issue in our case here is that, as we know, the discharge injunction is somewhat limited and is primarily injunctive. And we don't really have the opportunity to enforce the rights that we have under the consumer statutes in bankruptcy court. Well, are there any credit reports in the record? Yes, ma'am. That demonstrate a drop in credit score from Ocwen reporting any erroneous information after that first bankruptcy was settled. Your Honor, I'm not certain if there's a credit report in the record. It's universally understood that foreclosure and bankruptcy are the two biggest things that can impact your credit negatively under the universal credit scoring. So I don't know if there's a credit report in the appendix or not. I can't answer that, Your Honor. Now, as to Mr. Lynch's allegations, essentially this is no harm, no foul in his mind. He does not acknowledge that litigation was necessary to prevent them from taking her home. He's made passing mention, dismissive mention of the idea that Ms. Freeman had to pay money for attorneys to make that happen, to not get steamrolled by Ocwen in a foreclosure case at a time when she was three months ahead in her payments by Ocwen's own admission. So she suffered concrete harm prior to filing suit in this case, and we've never held in this circuit that a creditor could sue on a debt that was not in default, that the creditor was not even behind on, and not violate the FDCPA. Now, concrete harm involves the money she had to spend to keep from getting steamrolled by Ocwen in foreclosure court as well as the stress she experienced, and Ocwen has tried to make that go away by saying, well, we stopped after suit was filed. But that is nothing more than a mitigation of damage argument. That is not grounds to say there's not standing on Article III and there wasn't injury at the time the suit was filed. One thing I need to emphasize, and very quickly, I'm afraid there's confusion. We have never claimed that we disputed to Ocwen. We used the words in our pleading at 279, Ocwen willfully and negligently violated 1681S2B by failing to conduct a reasonable investigation upon receiving notice of freedman's dispute from one or more consumer reporting agencies and or by failing to review all relevant information provided by the consumer reporting agencies and or by failing to appropriately report the results of the investigations and or by failing to appropriately modify and or delete the inaccurate information. And by the way, in their brief, pages 6 through 8, they've admitted all their information was inaccurate. They discovered that investigating notices of error sent under RESPA. Mr. Wooten? Yes, sir. You made reference to AA239 in the appendix. Yes, sir. It's a non-party document production with a bait stamp TU. What is that document? It looks pretty technical, and who is it coming from? Yes, sir. And how is the district court supposed to interpret that document? I looked at that document. I can't figure it out.  So, Your Honor, again. How would the district judge interpret that? We didn't ask her to. We never got past motion to dismiss with that document. I know. That's the whole point. But my point is what we said is that courts are familiar with the allegation that there are ACDVs, which that's what this is. It's an ACDV. We're generalist judges, Mr. Wooten. Yes, sir. Yes, sir. If Judge Easterbrook was here, he would remind you. We are generalists. Yes, I understand, Your Honor, and I understand that these statutes can be very highly specialized. Now, again, we brought up the fact that these were in the record as part of the motion for reconsideration. But at the pleading stage, it has always been enough to say one or more credit reporting agencies provided the dispute to the furnisher. They failed to reinvestigate, and we suffered harm. That's where we were. And I'm afraid some of the confusion is because we're partially talking about summary judgment evidence with the FDCPA, and we're talking about a motion to dismiss standard with the FCRA. And it's been a bit conflated, and that may be partially my fault because I said – I'm not certain you're responding to the question. I'm sorry, Your Honor. A non-party TU-bait stamp. Yes. So that document is what the credit reporting world calls an ACDB. It is transmitted electronically by credit reporting agency to a furnisher. And in this case, it has in the top left, or actually it's because it's sideways, so it would be your lower left, it has Damona Freeman's name and her information, and it says right above her name, subscriber, which is the furnisher, that is Aquin, response date, February 13th of 2018. To comply with FCRA, a response is required by 2-26-18. Date entered 2-2-18. Date received 2-2-18. And who is this document coming from? Coming from the CRA and going to Aquin. So was that Equifax here? So this document appears to come from TransUnion. TransUnion, thank you. But it says right above the date where it says subscriber response date, 2-13-18, right above that it says the originating bureau is EFX, which we all in the credit reporting world know as Equifax. So what this means is this is a TU record of an ACDB that Equifax sent to Aquin with a response date required by February 26th of 2018. Thank you. But how could we have ever known that? Your Honor, if we were at summary judgment and you were this confused, I would have failed you as a lawyer. But at the pleading stage, we didn't have to be able to describe this in this detail. The reason we could is because this came out in the litigation between the motion to dismiss and the summary judgment on the FDCPA. What I'm saying is under the pleading standard of Rule 8, it has always been sufficient for us to say that there was a dispute because the dispute is a term of art under the FCRA that means that the furniture that the consumer disputed to a credit reporting agency and the credit reporting agency sent one of these documents we're looking at, AA 239 to the furniture triggering their duty to respond. Okay. Thank you. Anything else? Any questions I can answer for you because I apologize for creating confusion. No, I think that we're ready to tell you that we will take the case under advisement and we thank both of you. Thank you, Your Honor. Thank you, Mr. Wood. Thank you, Mr. Lynch.